UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| MARY L. DEFIBAUGH, | ) | Case No.: 1:26-cv-2246 |
| 4515 Comanche Trail | ) | |
| Jamestown, OH 45335, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETE HEGSETH, SECRETARY, | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| 1000 Defense Pentagon, | ) | |
| Washington, DC 20301 | ) | |
| Defendant. | ) | |
| | ) | Date: June 24, 2026 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### SUMMARY OF THE ACTION

1.      This is an action for age discrimination, disability discrimination, retaliation, hostile work environment harassment, failure to provide reasonable accommodation, and improper medical inquiry in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 633a, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.

2.      At all times relevant to this action, Plaintiff was employed by the Defense Human Resources Activity ("DHRA"), Defense Civilian Personnel Advisory Service ("DCPAS"), as a GS-12 Human Resources Specialist (Project Officer) assigned to the Wage and Salary Division.

3.      Plaintiff devoted approximately thirty-eight years of federal service to the United States Government and more than seventeen years of service to DHRA.

4.      Prior to the events giving rise to this lawsuit, Plaintiff had never been subjected to formal discipline during her federal career.

1

5.      Beginning in approximately 2022, Defendant, acting through Plaintiff's supervisors and management officials, subjected Plaintiff to disparate treatment, heightened scrutiny, unwarranted discipline, retaliation, hostile work environment harassment, telework-related restrictions, accommodation delays, and disability-related discrimination.

6.      Defendant's actions culminated in disciplinary actions, denial of Plaintiff's reasonable accommodation request, improper handling of Plaintiff's medical documentation, threats concerning leave and attendance, and continuing retaliation after Plaintiff opposed discriminatory conduct and engaged in protected EEO activity.

## JURY TRIAL DEMAND

7.      Plaintiff demands a bench trial on her ADEA claims pursuant to 29 U.S.C. § 633a(c), which does not provide a right to jury trial for federal-sector age discrimination claims. To the extent any claims under the Rehabilitation Act are triable by jury, Plaintiff hereby preserves that right pursuant to Fed. R. Civ. P. 38(b).

## JURISDICTION

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, specifically the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.

9.      Plaintiff brings her federal-sector age discrimination and retaliation claims pursuant to 29 U.S.C. § 633a, which prohibits discrimination in federal employment on the basis of age and authorizes aggrieved federal employees to bring civil actions in federal district court.

10.     Plaintiff brings her federal-sector disability discrimination, failure-to-accommodate, retaliation, hostile work environment, and confidentiality claims pursuant to Section 501 of the

Rehabilitation Act, 29 U.S.C. § 791, and the federal-sector enforcement provisions incorporated through 29 U.S.C. § 794a(a)(1).

11. Plaintiff seeks compensatory damages and other make-whole relief pursuant to 29 U.S.C. § 633a, 29 U.S.C. § 791, and 29 U.S.C. § 794a(a)(1). Compensatory damages for Rehabilitation Act violations are available pursuant to 42 U.S.C. § 1981a as incorporated by 29 U.S.C. § 794a(a)(1).

12. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), as incorporated by 42 U.S.C. § 2000e-16(d). Under that provision, venue lies in the district where the respondent has its principal office if no other district satisfies the venue criteria. Defendant Pete Hegseth is the Secretary of Defense, and the Office of the Secretary of Defense maintains its principal office at 1000 Defense Pentagon, Washington, D.C. 20301. As the head of the Department of Defense, the Secretary exercises ultimate statutory authority over the employment practices of all DoD components, including DHRA and DCPAS. The Final Agency Decisions challenged herein were issued over the signature of the DHRA Director, Jeffrey Register, an SES-level official whose own supervisory chain runs directly to the Under Secretary of Defense for Personnel & Readiness and the Secretary of Defense, both of whom operate from Pentagon offices with a Washington, D.C. mailing address. The employment records, EEO complaint files, and personnel systems at issue in this Complaint are maintained within DoD-wide human resources information systems administered at the Department level, which is headquartered in Washington, D.C.

13. Venue is independently proper pursuant to 28 U.S.C. § 1391(e)(1), which authorizes suit in any judicial district in which the defendant is an officer or employee of the United States acting in his official capacity. Defendant Hegseth is an officer of the United States whose official

residence and principal place of business is Washington, D.C. Additionally, the SES-level approval of the remote work waiver central to Plaintiff's accommodation claims was signed by DHRA Director Jeffrey Register, whose supervisory chain reaches the Acting Secretary of Defense, an official whose office is located in the District of Columbia or its immediate environs under DoD authority and whose decisions are attributable to Washington, D.C.-based headquarters authority. The agency's OGC, which coordinated the Final Agency Decisions and directed all legal aspects of the administrative proceedings, operates under the authority of DoD's Office of General Counsel, headquartered in Washington, D.C.

PARTIES AND EXHAUSTION OF ADMINISTRATIVE PROCESS

14.     Plaintiff Mary L. Defibaugh is a citizen of the United States.

15.     Plaintiff was born in 1950 and was over forty years of age at all times relevant to this action.

16.     Defendant Pete Hegseth is the Secretary of the Department of Defense and is sued solely in his official capacity.

17.     Plaintiff timely exhausted her administrative remedies through Agency Complaint No. DHRA-007-2023 (EEOC No. 570-2024-00106X).[1] The Defense Human Resources Activity generated a Final Agency Decision ("FAD") in that matter on November 4, 2025; however, the FAD was not issued/transmitted to Plaintiff's counsel until March 27, 2026, when DHRA EEO Director Shirley Raguindin emailed both FADs together via DoD SAFE in a single communication including FADs for both DHRA-007-2023 and DHRA-009-2024.[2] Plaintiff's

---

[1] Exhibit A — Final Agency Decision for DHRA-007-2023.
[2] Exhibit B— March 27, 2026, Email from Agency with DoD SAFE transmission of FAD for DHRA-007-2023 and FAD for DHRA-009-2024.

4

ninety-day period to file a civil action runs from March 27, 2026, the date of actual receipt of the FADs. Plaintiff timely files this civil action within ninety days of that date.

18.    Plaintiff timely exhausted her administrative remedies through Agency Complaint No. DHRA-009-2024 (EEOC No. 570-2025-00453X).[3] The Defense Human Resources Activity generated a Final Agency Decision in that matter on March 9, 2026; however, the FAD was not transmitted to Plaintiff's counsel until March 27, 2026, when DHRA EEO Director Shirley Raguindin transmitted both FADs simultaneously via DoD SAFE. That transmission constitutes official notification under 29 C.F.R. § 1614.407(a), and Plaintiff's ninety-day period to file a civil action runs from March 27, 2026, the date of actual receipt. Plaintiff timely files this civil action within ninety days of that date.

19.    Both Final Agency Decisions were signed by DHRA Director Jeffrey Register and transmitted to Plaintiff's counsel simultaneously on March 27, 2026, via a single email from DHRA EEO Director Shirley Raguindin through DoD SAFE.[4] Both FADs found that Plaintiff failed to prove discrimination, harassment, or failure to accommodate by a preponderance of the evidence. Plaintiff disputes those findings and brings this action to obtain de novo review.

FACTUAL ALLEGATIONS

**Plaintiff's Employment History**

20.    Plaintiff began federal service approximately thirty-eight years ago.

21.    Plaintiff began employment with the Defense Civilian Personnel Advisory Service ("DCPAS") in approximately December 2006.

---

[3] Exhibit C — Final Agency Decision for DHRA-009-2024.
[4] Exhibit B.

22.    Plaintiff served as a Human Resources Specialist (Project Officer) within the Wage and Salary Division and was responsible for overseeing prevailing wage surveys and related compensation matters affecting federal employees.

23.    Plaintiff was promoted to the GS-12 level and served in that position for many years.

24.    Throughout the overwhelming majority of her federal career, Plaintiff maintained a successful employment record and was never subjected to formal discipline.

25.    During the period relevant to this lawsuit, Plaintiff consistently received performance ratings of at least "Fully Successful."

26.    Mr. Fendt, Plaintiff's second-level supervisor and the deciding official for both the two-day and ten-day suspensions, admitted under oath at his June 20, 2024, deposition that Plaintiff "was always a fairly good worker" throughout his supervision and had consistently received performance ratings of satisfactory or above. He testified that she had always been performing her duties at at least a satisfactory level — a concession that directly undermines the Agency's characterization of her as a chronically deficient employee.

27.    Ms. Wlezien corroborated this at her June 21, 2024, deposition. She confirmed that Plaintiff was rated "fully successful" in all three performance elements for the entirety of Wlezien's supervision, including through 2024. Asked directly whether Plaintiff had "always been at least fully successful," Wlezien answered: "That is correct." She further confirmed this satisfied the federal government's minimum performance standards. Yet she continued to escalate discipline against Plaintiff despite these ratings.

28.    Prior to the events described herein, Plaintiff had established a reputation as an experienced and knowledgeable employee with decades of federal service.

**Reorganization and Transition to New Supervision**

29.     Prior to 2019, Plaintiff worked within the Dayton office under a different supervisory structure and utilized regional methodologies developed for the Central Region.

30.     In late 2019, the entire Dayton office was subject to a management-directed reassignment ("MDR") to Alexandria, Virginia, affecting all fourteen employees in Plaintiff's work group. Plaintiff accepted this reassignment on February 27, 2020; relocation was delayed by the COVID-19 pandemic, and Plaintiff worked remotely from Ohio throughout the delay.

31.     Upon coming under the supervision of Christine Wlezien ("S1") — who supervised the Alexandria-based team using "Eastern Orange Team Methodology" procedures different from those Plaintiff had used in Dayton — Plaintiff sought clarification and training regarding the new procedures.

32.     Defendant's management officials acknowledged that employees transferred from the former Dayton office performed portions of their duties differently than employees working within the Alexandria-based organizational structure. Defendant knew that employees transitioning from Dayton required additional training regarding local practices, procedures, and expectations.

33.     Despite this knowledge, Defendant failed to provide Plaintiff with adequate and timely training. Plaintiff repeatedly sought clarification, guidance, instruction, and assistance regarding survey procedures and related duties. Defendant failed to provide Plaintiff with the same level of coaching, support, and developmental opportunities afforded to similarly situated employees. Defendant nevertheless held Plaintiff responsible for alleged deficiencies that were directly related to the lack of training and guidance provided by management.

**The Relevant Management Officials**

34.    At all times relevant to this complaint, Plaintiff's first-level supervisor was Christine Wlezien ("S1"), Supervisory HR Specialist, Branch Chief, GS-0201-14 (year of birth: 1985). S1 was approximately thirty-five years younger than Plaintiff and was herself a named respondent in Plaintiff's prior EEO activity.

35.    Plaintiff's second-level supervisor was Karl Fendt ("S2"), Supervisory HR Specialist, Associate Director, GS-0201-15 (year of birth: 1976). S2 served as the deciding official for both the two-day suspension and the ten-day suspension. In his sworn ROI declaration for DHRA-009-2024, Mr. Fendt confirmed he became aware of Plaintiff's age approximately two years prior to the filing of that complaint "due to earlier EEO complaints age was listed" — an admission that his knowledge of Plaintiff's protected characteristic pre-dates the disciplinary actions challenged herein.

36.    Plaintiff's third-level supervisor was Taiwanna Smith ("S3") in case DHRA-007-2023, Director of Benefits, Wage and Non-Appropriated Fund Policy within DCPAS, GS-0201-15 (year of birth: 1960), with approximately 41 years of federal service. Karl Fendt was her direct report; Christine Wlezien was her indirect report. Ms. Smith supervised approximately 134 employees in total. She was deposed on June 20, 2024, in the EEOC proceeding for case DHRA-007-2023, and provided a sworn declaration in the ROI for DHRA-009-2024.

37.    The DHRA Reasonable Accommodations (RA) Program Manager was Brittany Mason ("DPM"), GS-0260-13 (year of birth: 1994), who administered Plaintiff's accommodation request. Ms. Mason had no prior EEO activity.

38.    Daniel Hester ("SES1"), DCPAS Director, received communications from Plaintiff referencing her accommodation request as early as August 2, 2024. Jeffrey Register ("SES2"),

DHRA Director, SES, approved Plaintiff's remote work arrangement outside the accommodation process on August 23, 2024 — four days after S1 denied Plaintiff's accommodation request on August 19, 2024.

**Age-Based Differential Treatment**

39.     Plaintiff was born in 1950 and was the oldest employee under Ms. Wlezien's direct supervision. Ms. Wlezien (born 1985) was approximately thirty-five years younger than Plaintiff. At all relevant times, Plaintiff was over forty years of age and within the protected age group under the ADEA.

40.     Plaintiff observed younger employees receiving assistance, coaching, and opportunities that were not provided to her. Plaintiff observed younger employees receiving corrections and guidance before disciplinary action was considered.

41.     A younger colleague ("CW2"), born in approximately 1963, committed the same or substantially similar performance deficiencies — accountability issues, missed deadlines, and work quality errors — and received only a Letter of Warning (a lesser action) issued by Ms. Wlezien on September 8, 2021. CW2 was not subjected to progressive suspension. He improved his performance following the warning and received no further formal discipline. Plaintiff, who had never been disciplined in nearly four decades of federal service, was subjected to escalating formal discipline — a reprimand, a two-day suspension, and a ten-day suspension — without being afforded comparable opportunity to improve under comparable supervisory conditions. No other employee under Ms. Wlezien's supervision received the same sequence of escalating discipline over the same period.

42.     Another colleague ("CW1"), born approximately 1959, also performed project officer duties and was held to less rigorous review standards than Plaintiff. CW1 sent out a letter

omitting his name without being subjected to the same level of scrutiny or correction that S1 imposed on Plaintiff for formatting errors. S1 acknowledged that errors from CW1 and CW2 were "within the bounds" of minor issues that did not require comprehensive rework, in contrast to her characterization of Plaintiff's errors.

43. Plaintiff repeatedly raised concerns regarding disparate treatment and unequal application of workplace standards. Defendant failed to investigate or correct Plaintiff's concerns.

44. The comparator disparity is further illustrated by the fact that, as of the June 20, 2024, deposition of Mr. Fendt, he had no prior experience serving as deciding official in a careless workmanship suspension against a project officer. When asked about Larry Snow, a male GS-12 project officer with the same title and duties as Plaintiff, Mr. Fendt confirmed that Mr. Snow had, to his knowledge, never received a letter of warning for careless workmanship. The Agency imposed a Letter of Reprimand, two-day suspension, and ten-day suspension on Plaintiff while leaving similarly situated younger employees without comparable formal discipline.

45. Ms. Wlezien's deposition testimony makes the disparate treatment even clearer. Wlezien confirmed she issued Lawrence Snow a letter of warning in 2019 for similar performance issues, after which he improved and was never subjected to further formal discipline. She admitted that Snow's errors after the warning were "minor issues that get fixed" within acceptable bounds. By contrast, Wlezien never issued Plaintiff a letter of warning before escalating directly to a letter of reprimand in October 2022 — even though she had drafted a letter of warning for Plaintiff in late 2019 or early 2020, processed it through HR and legal counsel, and then chose never to issue it. The Agency deliberately withheld from Plaintiff the lesser corrective action it gave to comparator employees.

46.    Ms. Wlezien is younger than 40 years of age. She confirmed at deposition that all three of her project officers — including Plaintiff — are over 40, and that only one of her five data collectors is over 40. Plaintiff, born in 1950, is older than both other project officers (born approximately 1959 and 1963) and substantially older than Wlezien herself (born 1985). The pattern of discipline — escalating from warning to reprimand to two-day suspension to ten-day suspension — fell exclusively on the oldest member of the project officer team.

**October 2022 Letter of Reprimand**

47.    On October 3, 2022, Defendant issued Plaintiff a Letter of Reprimand alleging "careless workmanship" arising from Plaintiff's handling of four separate wage surveys since May 2022. The reprimand was the first formal disciplinary action Plaintiff had received during nearly four decades of federal service. The reprimand failed to comply with applicable regulatory guidance requiring specificity: no attachments or supporting documentation were provided with the reprimand to substantiate the charges, and the reprimand lacked the specificity required to enable Plaintiff to meaningfully identify or respond to the alleged deficiencies.

48.    Plaintiff disputed the allegations contained within the reprimand. Plaintiff advised management that many of the alleged deficiencies were attributable to inadequate training, inconsistent guidance, and differing procedures utilized by former Dayton personnel, as well as Plaintiff's lack of training in the "Eastern Orange Team Methodology" used by the Alexandria office. Plaintiff had repeatedly requested additional training and clarification before the disciplinary action was issued.

49.    The reprimand adversely affected Plaintiff's employment and served as the foundation for the escalating discipline that followed. When Plaintiff was compelled to physically report to the Mark Center office in May 2024, she was the only employee in her work group required to

do so; no other employee under Ms. Wlezien's supervision was required to report to the Mark Center in person during that period. Plaintiff had been working remotely since March 2020, and this compelled in-person reporting directly precipitated the medical flare-ups that led to her May 17, 2024, reasonable accommodation request.

**Protected Activity**

50. On October 19, 2022, Plaintiff filed an administrative grievance challenging the reprimand. Plaintiff asserted that she was being subjected to age discrimination, harassment, and disparate treatment. Plaintiff specifically complained that younger employees were treated more favorably and that management was applying standards to her that were not applied to similarly situated coworkers.

51. Defendant's management officials became aware of Plaintiff's complaints. Ms. Wlezien subsequently acknowledged that she became aware of Plaintiff's age-discrimination allegations through the grievance process and related communications.

52. On February 28, 2023, Plaintiff initiated contact with the DHRA EEO Counselor, initiating the formal EEO process that became Agency Complaint No. DHRA-007-2023. On April 10, 2023, Plaintiff filed a formal EEO complaint. Plaintiff named Ms. Wlezien and Mr. Fendt as responsible management officials.

53. Plaintiff further engaged in protected EEO activity by participating in an EEOC hearing process, submitting sworn testimony, and having her counsel take depositions of Ms. Wlezien and Mr. Fendt on or about June 20–21, 2024 as part of that proceeding. Defendant was aware of all of Plaintiff's protected activity at all relevant times.

**Escalation of Discipline After Protected Activity**

54.    Following Plaintiff's protected activity, Defendant subjected Plaintiff to additional scrutiny. Management increasingly monitored Plaintiff's work product. Plaintiff's work was subjected to heightened review beyond that imposed on similarly situated employees. Plaintiff was required to respond to repeated inquiries regarding assignments and work products.

55.    On January 30, 2023 — approximately three months after Plaintiff filed her administrative grievance alleging age discrimination — Ms. Wlezien proposed a two-day suspension against Plaintiff. The proposal again relied upon allegations of "careless workmanship." Mr. Fendt issued the Decision to Suspend on February 27, 2023. Plaintiff provided an oral response but did not attend a rescheduled meeting; the agency nonetheless proceeded with the suspension.

56.    In or around April 2024, Plaintiff sent a direct email to DCPAS Director Daniel Hester raising concerns about the management-directed reassignment, the costs she was being required to bear for the transfer, and why the relocation was being initiated given that she had been working successfully in a remote capacity for a number of years. Plaintiff received no substantive response from Mr. Hester. Additionally, at a staff meeting with all employees under her supervision, Ms. Wlezien had previously represented that Plaintiff would likely be permitted to continue working remotely notwithstanding the management-directed reassignment. Plaintiff reasonably relied on this representation. Plaintiff believes her April 2024 email to Mr. Hester — which formally questioned the basis and costs of the forced relocation — contributed to Ms. Wlezien's decision to propose the ten-day suspension shortly thereafter.

57.    On May 3, 2024 — approximately two weeks before Plaintiff submitted her reasonable accommodation request, one week before Plaintiff undertook a government-funded house-

hunting trip to Alexandria as part of her MDR, and approximately seven weeks before Ms. Wlezien and Mr. Fendt were deposed in Plaintiff's pending EEOC proceeding (depositions: June 20–21, 2024) — Ms. Wlezien proposed a ten-day suspension against Plaintiff. The temporal proximity between the notice that Plaintiff intended to depose Ms. Wlezien and Mr. Fendt in her pending EEOC proceeding, Plaintiff's accommodation request, and the proposed suspension supports a reasonable inference of retaliatory motive. Mr. Fendt decided the suspension on May 30, 2024, after reviewing Plaintiff's written response and sworn affidavit disputing the charges.

58.     In deciding the two-day and ten-day suspensions, Mr. Fendt admitted at deposition that he never completed the Douglas Factor analysis form required by Agency policy — the form that documents a deciding official's consideration of the twelve merit-system factors courts review for due process compliance. He testified he performed the analysis "in his head" without documentation. Ms. Wlezien confirmed at her deposition that Douglas Factors were never discussed with her by HR when she proposed any disciplinary action, and that she did not consider them. Neither the proposing official nor the deciding official for any of the three disciplinary actions against Plaintiff completed the required Douglas Factor analysis worksheet. The absence of this documentation prevents meaningful judicial review of the actual reasoning and supports an inference that the articulated rationale was pretextual.

59.     Defendant continued to characterize Plaintiff's work as deficient despite her Fully Successful performance ratings, continued to rely upon alleged errors while disregarding Plaintiff's repeated requests for training and assistance, and continued to escalate discipline rather than provide the coaching it provided to younger colleagues.

**December 2022 Untimely Midyear Performance Review**

60.    On December 8, 2022, Ms. Wlezien issued Plaintiff a midyear performance review. This review was untimely (the standard timeframe was October), and it was issued the day after the decision on Plaintiff's October 2022 grievance was found untimely. Due to a system issue, Plaintiff was unable to add comments to the review, and Ms. Wlezien retrieved the appraisal before Plaintiff could address the system problem. These facts support an inference of retaliatory timing and intent.

**December 2023 Travel Voucher Obstruction and Survey Interference**

61.    In December 2023, Ms. Wlezien delayed Plaintiff's travel orders for a survey assignment. The delay arose in part because Ms. Wlezien had provided the correct fund site code to the thirteen other employees on the western region team but excluded Plaintiff, causing Plaintiff's travel order to contain an error that was solely attributable to management's failure to include Plaintiff in the team communication. This exclusion is evidence of differential treatment and discriminatory targeting.

62.    After Plaintiff traveled on the corrected orders, Ms. Wlezien delayed approval of Plaintiff's travel voucher until the last permissible date, while approving comparable employees' vouchers within approximately two days. The record reflects that the voucher was returned for corrections at least in part due to errors arising from Plaintiff's initial exclusion from fund site communications.

63.    On or about December 21, 2023, Ms. Wlezien directed Plaintiff to change all the assignments she had already distributed to four team members on the Dayton survey without first consulting Plaintiff or explaining the reason for the change. Despite the last-minute disruption,

15

Plaintiff completed the survey on time. Ms. Wlezien's directive was outside normal practice and served to interfere with Plaintiff's survey management.

**Hostile Work Environment**

64.    Beginning no later than 2022 and continuing through 2024, Defendant subjected Plaintiff to a sustained pattern of conduct that, viewed in its totality, constitutes a hostile work environment based on age, disability, and protected EEO activity. This pattern includes: (a) an October 2022 Letter of Reprimand based on allegations Plaintiff disputed, issued despite management's acknowledged failure to provide adequate training; (b) a January 2023 proposed two-day suspension approximately three months after Plaintiff's protected grievance; (c) an untimely midyear performance review issued the day after the grievance decision was found untimely, which prevented Plaintiff from adding comments due to a system issue management declined to resolve; (d) a campaign of heightened scrutiny of Plaintiff's work product from 2022 through 2024 that was not imposed on comparator employees; (e) Ms. Wlezien's deliberate exclusion of Plaintiff from a fund-site communication that caused Plaintiff's December 2023 travel order to contain an error; (f) Ms. Wlezien's December 2023 demand that Plaintiff reassign survey assignments without consultation; (g) delayed travel voucher approval while comparable employees' vouchers were processed quickly; (h) a May 2024 proposed ten-day suspension within weeks of deposition notices in Plaintiff's pending EEOC proceeding; (i) an AWOL threat over medically supported sick leave in May 2024 concurrent with Plaintiff's accommodation request; (j) obstruction of Plaintiff's accommodation request through form disputes spanning months; (k) denial of accommodation followed immediately by approval of the same practical relief outside the accommodation framework, depriving Plaintiff of the legal protections the accommodation process was designed to provide; (l) S3 Taiwanna Smith's receipt and deliberate

16

non-response to Plaintiff's January 30, 2023 harassment complaint email, followed by a materially false sworn affidavit in the EEO administrative record denying any knowledge of that complaint; and (m) the Agency's violation of its own OI 3-2-21 five-business-day deadline for initiating the interactive process, its failure to issue required written acknowledgment of Plaintiff's RA request, and its omission from the denial forms of the July 22, 2024, advanced sick leave interim accommodation — all of which collectively denied Plaintiff the procedural protections DHRA's own policies required.

65.    When Plaintiff raised concerns about age discrimination with Mr. Fendt in early 2023, Mr. Fendt conducted a review and found the complaints "without merit" without further investigation or corrective action, leaving the harassing conditions unaddressed and the pattern to continue.

66.    Mr. Fendt's response to Plaintiff's harassment complaints was also procedurally deficient. Plaintiff notified Mr. Fendt of harassment in writing in November 2022 and again in January 2023. The Agency's anti-harassment policy — applicable to Mr. Fendt as a supervisor — required that supervisors and management officials promptly notify the anti-harassment coordinator of harassment allegations within ten business days and that all findings of fact be documented in a written report. Mr. Fendt admitted under oath at his June 20, 2024, deposition that he did not follow this policy: he did not refer either complaint to the anti-harassment coordinator, did not notify the DHRA Director or any other required authority, and did not produce a written report of findings as required. When asked directly whether he followed the policy, Mr. Fendt answered "no." He acknowledged having received annual training on this policy for years and acknowledged that the policy's "must" and "will" language was mandatory.

67.     Ms. Wlezien independently confirmed the Agency's failure to follow its anti-harassment obligations. She admitted at deposition that she was "not familiar" with the Agency's anti-harassment operating instruction and had never seen it. She confirmed that when Plaintiff emailed her on November 25, 2022, alleging age-based harassment, Wlezien's only response was to tell Plaintiff to contact the EEO office: "That's all I did." She took no other steps. She admitted she never received any training advising her of responsibilities beyond EEO referral. The Agency's failure to enforce its own anti-harassment policy when Plaintiff reported harassment — by two separate supervisors who each individually failed to follow mandatory procedures — directly enabled the ongoing pattern of discrimination and retaliation to continue.

68.     The failure of the Agency's anti-harassment response extended to S3, Taiwanna Smith, Plaintiff's third-level supervisor and Mr. Fendt's direct superior. At her June 20, 2024, deposition, Ms. Smith initially testified under oath that Plaintiff had never reported harassment to her, that she had never received such a report in her 41-year federal career, and that no action had been taken because there was nothing to act upon. When Plaintiff's counsel confronted Ms. Smith with a January 30, 2023, email from Plaintiff — addressed to Karl Fendt with Ms. Smith copied — specifically alleging age-based harassment and referencing Plaintiff's EEO activity, Ms. Smith acknowledged receiving the email but claimed she had forgotten it. She conceded: "I clearly forgot about the e-mail." Ms. Smith further acknowledged that this email was the only harassment complaint she had ever received in 41 years and that, despite the gravity of that complaint, she did not independently respond to the employee, did not verify what steps Fendt actually took, received no written documentation of any investigation outcome, and could not describe the specific investigation steps taken. Her entire oversight response consisted of an

18

undocumented verbal exchange with Mr. Fendt. No HR notification, no written findings, and no follow-up with the complainant were ever made.

69.     Ms. Smith's sworn EEO affidavit, signed in October 2023, stated that Plaintiff never informed her of any harassment allegations and that no actions were taken. At deposition she admitted this statement was materially inaccurate because she had not reviewed her email records before signing it, had "rushed through" completing the affidavit, and provided her answers purely from contemporaneous memory without verification — despite acknowledging the affidavit's warning about the legal consequences of false statements. When asked directly why she answered "no" rather than "I do not recall," Ms. Smith conceded that stating she did not recall "would have been more appropriate." The materially false denial of Plaintiff's harassment report in a sworn EEO affidavit deprived the EEO investigator of relevant evidence, tainted the administrative record underlying the Final Agency Decision, and further prejudiced Plaintiff's ability to obtain timely relief. The three-supervisor pattern of anti-harassment policy violations — Wlezien's failure to act, Fendt's failure to follow mandatory procedures, and Smith's undocumented delegation followed by a false sworn statement — reflects a systemic institutional failure to respond to Plaintiff's harassment reports at every level of management.

70.     Notably, Ms. Wlezien also admitted at deposition that after the two-day suspension, Plaintiff's performance improved: she was "doing pretty well for like the first six to eight months," her errors became minor and within acceptable bounds comparable to other employees, and she engaged more proactively with training. This admission directly undermines the Agency's narrative that escalating discipline was a proportionate and necessary response to irredeemable performance failures, and supports the inference that the ten-day suspension

proposed in May 2024 — just weeks before depositions in Plaintiff's EEO proceeding — was retaliatory rather than corrective.

71.     Defendant's actions created an intimidating, hostile, and abusive working environment. The cumulative effect of Defendant's actions altered the terms and conditions of Plaintiff's employment.

**Plaintiff's Disabilities**

72.     Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD) and anxiety. These conditions substantially limit one or more of Plaintiff's major life activities, including but not limited to memory, concentration, focus, judgment, emotional regulation, and occupational functioning. Plaintiff's conditions are episodic in nature, with symptoms that fluctuate depending on environmental triggers.

73.     Defendant became aware of Plaintiff's medical conditions no later than May 17, 2024, when Plaintiff submitted her accommodation request to Ms. Mason, and no later than May 22, 2024, when Ms. Wlezien received Plaintiff's accommodation request packet containing redacted medical documentation. The ROI for DHRA-009-2024 confirms Ms. Wlezien became aware of Plaintiff's medical impairment on May 22, 2024, and "did consider CP to have a medical impairment" from that date forward.

74.     Mr. Fendt learned of Plaintiff's specific medical conditions in August or September 2024 when Plaintiff's representative sought reconsideration of the denial. Mr. Hester (SES1) received an email on August 2, 2024, from Plaintiff referencing her accommodation request and attaching a physician's note referencing "flare ups" and "exacerbations," and separately learned of Plaintiff's prior EEO complaint on October 6, 2023, from EEO Point of Contact Faynetta Jennings.

75.     Mr. Register (SES2) was copied on emails regarding the RA process and signed the August 23, 2024, remote work approval memorandum, which was prepared by Ms. Wlezien and signed by both Fendt and Hester, and which expressly references Plaintiff's circumstances including her disciplinary history. By the time the accommodation was denied in August 2024, all relevant decision-makers were aware of or had been placed on notice of Plaintiff's disability.

**Reasonable Accommodation Request and Interactive Process**

76.     On May 17, 2024, Plaintiff submitted a written request for reasonable accommodation to Ms. Wlezien and Ms. Mason. The request was supported by a physician's note dated May 14, 2024, from Plaintiff's treating physician, which diagnosed Plaintiff with PTSD and anxiety, identified specific functional limitations including impaired memory, focus, concentration, judgment, and occupational functioning, and explained that Plaintiff's symptoms were better managed in a remote work environment. The physician specifically recommended full-time telework or remote work as an accommodation.

77.     Plaintiff requested: (1) full-time telework or remote work; (2) additional time to complete tasks during symptom flare-ups; (3) the ability to use leave to manage flare-up symptoms; and (4) in the alternative to full-time remote work, reassignment to a position authorized for full-time telework. Plaintiff also requested an interim accommodation of full-time telework or administrative leave pending processing.

78.     The Agency violated its own Operating Instruction (DHRA OI 3-2-21) from the outset of Plaintiff's request. That OI requires the approving official to confirm the request and begin the interactive process within five business days of receipt. Plaintiff submitted her RA request on May 17, 2024. Rather than begin the interactive process within five days as required, Ms.

21

Wlezien proposed delaying the interactive meeting until the week of June 10, 2024 — nearly thirty days later.

79.    Plaintiff's counsel objected in writing on May 22, 2024, noting that the medical documentation provided stated that failure to provide effective accommodations promptly would cause an exacerbation of Plaintiff's conditions, and requesting that the meeting be conducted on May 23 or 24, 2024. The Agency declined and maintained the June 10 date.

80.    The Agency's own ROI (DHRA-009-2024) confirms this thirty-day delay was part of the administrative record. Separately, the RA Program Manager (Ms. Mason) failed to issue the required written acknowledgment on DHRA Form 5 within five business days of the request. In addition, on July 22, 2024, Ms. Wlezien approved advanced sick leave for Plaintiff as an interim accommodation — a fact omitted entirely from the denial forms (DHRA Forms 4 and 5) issued on August 21, 2024. The denial forms thus materially misrepresented the record of interim accommodations provided, and those forms were never corrected despite Plaintiff's counsel's written demand.

81.    On May 28, 2024, Agency Counsel characterized the May 14 physician's note as "so conclusory" that the Agency could not determine what factors at the Mark Center were at issue. On May 29, 2024, Ms. Wlezien asked Plaintiff three questions: (1) what specific aspects of working at the Mark Center are problematic; (2) what about Plaintiff's condition has changed since she last worked in an office in 2020; and (3) why Plaintiff waited until after a house-hunting trip to request accommodation.

82.    On June 4, 2024, Plaintiff's treating physician provided a second, more detailed letter addressing the Agency's questions. The physician explained that office environments like the Mark Center expose Plaintiff to uncontrollable triggers including lighting, acoustics, smells, and

interactions with others that exacerbate her PTSD and anxiety symptoms. The physician confirmed that Plaintiff's symptoms had worsened since 2020 due to increased overall stress and traumatic events.

83.     On June 10, 2024, Plaintiff and her attorney participated in an interactive discussion with Ms. Wlezien. During that discussion, Plaintiff explained that at survey sites during work travel, she managed flare-ups by removing herself from the office, taking breaks, going for a walk, or taking a lunch break — coping strategies that would not be available in the fixed Mark Center office environment. This explanation directly addressed the Agency's later assertion (made in Mr. Fendt's September 9, 2024 reconsideration denial) that Plaintiff's ability to work at survey sites during travel contradicted her claim that she could not work in an office environment; the record shows the Agency was aware of Plaintiff's explanation and Mr. Fendt's characterization is factually unsupported.

84.     As an interim accommodation, the Agency offered only a private office and a maxi-flex schedule — accommodations that did not address Plaintiff's documented need to control environmental triggers, since the private office at the Mark Center did not permit Plaintiff to control lighting, acoustics, or other sensory factors in the way remote work would. Plaintiff's physician specifically explained that remote work allowed Plaintiff to personalize her workspace environment to control these factors and limit flare-ups.

85.     Ms. Wlezien confirmed the inadequacy of the interim accommodation at deposition: she admitted that on May 18, 2024, Plaintiff experienced a medical flare-up while in the interim office and had to leave. When asked whether an accommodation that causes the employee to suffer a medical flare-up is effective, Wlezien did not dispute the obvious answer. She further admitted she was unable to authorize remote work because of discipline — yet also confirmed

Plaintiff had been successfully performing remotely for two fiscal years despite that same discipline. When asked at the close of the deposition whether she understood that failing to provide an effective accommodation makes a supervisor liable under the Rehabilitation Act, Wlezien responded: "I do now."

**CHS Authorization Dispute and Bad-Faith Delay**

86.     Following the June 10 interactive discussion, Ms. Mason informed Plaintiff that the Agency was referring the accommodation request to Comprehensive Health Services ("CHS"), a DHRA-contracted third-party medical review board, to obtain an independent medical review. On June 13, 2024, Ms. Mason sent Plaintiff two CHS-specific forms: a "Notice of Privacy Practices for Protected Health Information" and an "Authorization for Use and Disclosure of Health Information."

87.     Plaintiff's attorney objected to the CHS forms on the grounds that they authorized CHS to use Plaintiff's medical information for "evaluation purposes relating to medical screening, employment or assessment of [Plaintiff's] fitness for duty" — a scope of medical inquiry broader than what is permitted under the Rehabilitation Act for reasonable accommodation purposes, which limits medical inquiries to information that is job-related and consistent with business necessity. Plaintiff's attorney offered multiple alternative authorizations, including a DoD Form 2870 and a HIPAA Authorization Form signed by Plaintiff on July 10, 2024, each of which expressly authorized CHS to receive Plaintiff's medical information for purposes of her accommodation request.

88.     The Agency, through Ms. Mason and Agency Counsel David Daniels, rejected every alternative authorization submitted by Plaintiff and insisted exclusively on the two CHS-specific forms. By August 14, 2024 — more than sixty days after the initial CHS referral — Plaintiff had

submitted at least four separate signed authorizations that the Agency refused to accept. The Agency then cited Plaintiff's alleged sixty-day non-responsiveness as the basis for denying her accommodation request on August 19, 2024.

89.     On August 14, 2024, Plaintiff's attorney contacted CHS directly, providing two signed health-release authorizations along with Plaintiff's medical documentation, position description, and accommodation request. On August 26, 2024, a CHS representative responded that CHS could not process the request because it had not been initiated by DHRA, and that the two required CHS consent forms were necessary for CHS to proceed. Critically, the CHS representative confirmed that CHS could and would conduct the review if DHRA authorized it and Plaintiff completed the CHS forms. The Agency did not use this information to facilitate the process; instead, it continued to deny the accommodation.

90.     The record reflects that Agency Counsel David Daniels directed Ms. Mason's handling of the authorization forms and advised on the legality of the Agency's approach throughout the process. This is confirmed by the ROI for DHRA-009-2024: when asked who else was involved in requiring Plaintiff to complete the CHS forms and why the forms were required, Ms. Mason responded "N/A" — indicating she could not or would not identify the basis for that decision independently of Daniels' direction. Daniels' own August 23, 2024, email to Plaintiff's counsel acknowledged that the CHS form was "broader than merely for RA purposes" but characterized it as "hardly worth arguing about" — an admission that Daniels understood the improper scope of the forms and chose to insist on them anyway. Further, the August 23, 2024 remote work approval memorandum — prepared by Ms. Wlezien, signed by Mr. Fendt on August 14 and Mr. Hester on August 15, before the August 19 accommodation denial — lists at TAB F "DHRA OGC Coordination," confirming that Mr. Daniels was consulted on and participated in the

25

remote work approval process contemporaneous with the accommodation denial. This OGC coordination establishes that Agency counsel simultaneously advised that full-time remote work raised zero operational concerns while directing the Agency to deny Plaintiff's accommodation request for that same arrangement.

91.    Plaintiff reasonably believes, and the record supports the inference, that the Agency's insistence on the CHS-specific forms — which contained fitness-for-duty language going beyond what Plaintiff's accommodation request required — was a pretext designed to delay or defeat her accommodation request rather than a good-faith effort to assess her medical needs.

**Denial of Accommodation**

92.    On August 19, 2024, Ms. Wlezien denied Plaintiff's accommodation request, citing (1) inadequate medical documentation and (2) Plaintiff's alleged repeated failure to provide the CHS authorization forms. The denial noted that Complainant had been provided interim accommodations of a maxi-flex schedule and a private office. The denial further noted that the Agency was proceeding with a separate remote work policy waiver from SES2 (Jeffrey Register) outside the accommodation process.

93.    On September 3, 2024, Plaintiff's attorney sought reconsideration from Mr. Fendt. On September 9, 2024, Mr. Fendt denied reconsideration. In his sworn ROI declaration, Mr. Fendt confirmed that he had "no discussions with myself and Ms. Defibaugh on RA request" — meaning the deciding official for reconsideration never directly engaged with Plaintiff in any interactive process whatsoever. He further confirmed in that same declaration that his knowledge of Plaintiff's medical conditions came solely from Plaintiff's attorney's request for reconsideration in August/September 2024, and that he had not been involved in processing the original RA request. His stated reason for denying reconsideration — that Plaintiff's ability to

work at survey sites during travel contradicted her claim that she could not work in an office environment — ignored Plaintiff's own explanation provided during the June 10 interactive discussion and documented in the DHRA Form 3 worksheet, that she managed flare-ups at survey sites through breaks and walks that would not be available at the Mark Center. His declaration further reveals that he offered to "gladly reopen the request" if Plaintiff cooperated with the CHS form process — an admission that the RA request was not substantively meritless, only procedurally blocked by a form dispute his own Agency created. Mr. Fendt's stated rationale is factually unsupported by the record and pretextual.

94.     The Agency's denial of reconsideration also stated that the RA request was "moot" because SES2 had approved remote work outside the accommodation process. This framing improperly conflated a discretionary management policy waiver with the legal protections of the Rehabilitation Act's accommodation framework, depriving Plaintiff of the procedural safeguards, anti-retaliation protections, and right to seek corrective action available under that framework.

95.     Mr. Fendt himself — the deciding official for the reconsideration denial — admitted at his June 20, 2024, deposition that reasonable accommodation is "totally separate" from remote work or telework eligibility. He testified that even in a climate where no one could remote work due to disciplinary issues, reasonable accommodation could independently require that arrangement if it was reasonable and appropriate. His reconsideration denial therefore rested on a legal theory he himself rejected under oath. His sworn ROI declaration for DHRA-009-2024 deepens this contradiction: when asked whether Plaintiff's medical conditions had any impact on her ability to perform essential functions, he answered "See Q39," which itself deferred to the August/September 2024 reconsideration request — meaning his entire assessment of her

disability was formed solely from one-sided post-denial advocacy materials, not from any direct evaluation, interactive discussion, or medical review.

96.    He confirmed he was never involved in the original RA process, never spoke directly with Plaintiff about her request, and his only role was reviewing and declining the reconsideration — a role he exercised without ever having participated in the interactive process the Rehabilitation Act requires.

**Approval of Remote Work Outside the Accommodation Process**

97.    On August 23, 2024 — four days after S1 denied Plaintiff's accommodation request and the same day Plaintiff was formally notified of the denial — SES2 Jeffrey Register approved Plaintiff to work remotely from her home in Fredericksburg, Virginia, effective July 24, 2024. This means Plaintiff had already been working remotely for approximately a month at the time her accommodation request was formally denied.

98.    The remote work approval memorandum — prepared by Ms. Wlezien and signed by Mr. Fendt on August 14, 2024, Mr. Hester on August 15, 2024, and Mr. Register on August 23, 2024 — reflected that Plaintiff had been working remotely since March 2020 (more than four years) without any identified mission impact, security concern, financial hardship, or operational disruption. Critically, Mr. Fendt signed the remote work approval memo on August 14, 2024 — five days before Ms. Wlezien issued the accommodation denial on August 19, 2024, and nearly a month before he served as deciding official for the reconsideration denial on September 9, 2024.

99.    Mr. Hester signed it on August 15, 2024 — four days before the accommodation denial issued. Thus, the officials who approved Plaintiff's full-time remote work knew it created zero mission impact at the very moment the accommodation request for that same arrangement was being denied. The memorandum expressly found: mission impact — None; security

considerations — None; financial impact — None; travel/TDY impact — None; time zone difference impact — None. The only stated reservation was monitoring Plaintiff's conduct given her disciplinary history — a reservation that does not constitute undue hardship. Agency officials acknowledged that Plaintiff's remote work arrangement created no mission impact, no security concerns, no financial hardship, and no travel-related hardship.

100.    Defendant's approval of full-time remote work — through the same chain of officials who were aware of and involved in the accommodation denial — directly undermines the Agency's stated rationale for that denial. The Agency's own conduct demonstrates that full-time remote work created no undue hardship, that the requested accommodation was both reasonable and feasible, and that the denial was not justified by legitimate operational concerns.

101.    Defendant's approval of the same remote-work arrangement while simultaneously denying Plaintiff's accommodation request is further evidence of both pretext and retaliatory motive.

102.    At no time did Defendant identify any operational, security, financial, or mission-related reason why full-time remote work would impose an undue hardship. To the contrary, Defendant expressly determined that no such hardship existed when approving the remote-work arrangement outside the accommodation process.

103.    The practical effect of the denial was to deprive Plaintiff of the legal protections and remedies available under the Rehabilitation Act's accommodation framework, while giving the Agency the ability to claim it had ultimately provided the relief requested.

**Sick Leave and AWOL Threat**

104.    On May 20, 2024, Plaintiff emailed Ms. Wlezien requesting sick leave for that day, and on May 21 extended the request through the end of the week (May 20–24). Plaintiff had

29

previously advised Ms. Wlezien she would be attending a deposition in her pending EEO case on May 21, 2024.

105.   Ms. Wlezien requested a doctor's note since the absence exceeded three days. Plaintiff submitted a note on May 24 stating she had been "under [physician] care" from May 20–24. Ms. Wlezien rejected this note as insufficient because it did not state Plaintiff was "unable to work." On June 13, 2024, Ms. Wlezien threatened to change the sick leave to AWOL status unless Plaintiff provided revised documentation or converted the leave to annual leave.

106.   On June 13, 2024, Plaintiff submitted a revised physician's note confirming she was "under [physician] care and was unable to work" from May 20–24. On June 21, 2024, Ms. Wlezien approved the sick leave — demonstrating that the leave was medically justified throughout. The threat to convert the leave to AWOL, made while Plaintiff's accommodation request was pending and shortly after Ms. Wlezien participated in depositions in Plaintiff's EEO proceeding, reflects discriminatory and retaliatory intent.

**Moving Expense Voucher Delay**

107.   Moving expense voucher reimbursement associated with Plaintiff's government-funded house-hunting trip in May 2024 was unreasonably delayed. While the Agency characterized the delay as resulting from Plaintiff's errors, the record reflects that at least some errors arose because Ms. Wlezien had not provided Plaintiff with the correct fund cite information. This was not an isolated incident: in December 2023, Ms. Wlezien similarly failed to provide Plaintiff with the correct fund cite for Plaintiff's travel to Washington, D.C., while providing that information correctly to the other employees on the same trip. This pattern of selective exclusion of Plaintiff from fund-site communications — occurring on at least two separate occasions —

foreseeably caused errors in Plaintiff's travel authorizations and vouchers and provided management with a pretext to characterize those errors as Plaintiff's fault.

108.    Additionally, prior to the events giving rise to this lawsuit, Plaintiff had been approved to participate in a federal phased retirement program that would have entitled her to six months of paid leave in lieu of continued active employment, a benefit available to eligible long-service federal employees. Defendant denied or prevented Plaintiff's participation in this approved program unless she dropped all of her EEOC claims against the Agency.

109.    Plaintiff believes this denial was motivated by discriminatory and retaliatory animus — specifically, that Defendant's management officials sought to deprive Plaintiff of an earned retirement transition benefit to which she was entitled, while leveraging the manufactured disciplinary record against her as a pretext. The denial of the approved phased retirement program constitutes an additional adverse employment action for which Defendant is liable.

110.    In an effort to resolve the hostile work situation cooperatively, Plaintiff requested at various times that she be reassigned to a different supervisor. Mr. Fendt denied this request, testifying at deposition that it was "not mission appropriate" — a determination he made unilaterally. Plaintiff also considered a voluntary demotion to exit the hostile situation; that process was initiated but Plaintiff ultimately withdrew the request. Defendant's refusal to reassign Plaintiff to avoid retaliation, while simultaneously citing her performance as grounds for escalating discipline, further demonstrates the retaliatory and discriminatory environment Plaintiff endured.

111.    The ROI compiled for DHRA-009-2024 further corroborates the comparator evidence relevant to Plaintiff's age discrimination claims. Lawrence Snow (born 1963, no prior EEO activity), GS-0201-12 HR Specialist, confirmed under oath that he and Plaintiff are coworkers

sharing the same supervisory chain — Christine Wlezien (first-level), Karl Fendt (second-level), Taiwanna Smith (third-level), and Daniel Hester (fourth-level). Roy Poorker (born 1959, no prior EEO activity), GS-0201-13 HR Specialist, similarly confirmed he and Plaintiff are coworkers and that he never observed Ms. Wlezien treat Plaintiff in a harassing, derogatory, or inappropriate manner — testimony that, at best, reflects a failure to observe rather than an absence of mistreatment, and does not address the documentary record of discipline and accommodation failures.

112.    When asked for comparative data on other employees who submitted signed authorizations to release medical documentation, Ms. Mason responded "N/A," confirming that no other employee under the same management chain was ever required to submit the CHS-specific authorization forms Plaintiff was required to complete. Plaintiff was thus uniquely subjected to a medical authorization demand that lacked any comparator basis.

113.    The ROI also documents that Agency Counsel David Daniels advised Ms. Mason on the legality of Agency policies and practices throughout the RA process, confirming his direct role in directing the course of conduct Plaintiff challenges. Mr. Register's ROI declaration denies knowledge of Plaintiff's medical conditions and states he "disregarded" emails copied to him about her RA because they were not addressed to him — a position contradicted by the documentary evidence showing his signature on the August 23, 2024, remote work approval memorandum, which was prepared by Ms. Wlezien and signed by Mr. Fendt and Mr. Hester four days before Register, and which contains a specific evaluation of Plaintiff's circumstances including her disciplinary history and mission impact.

114.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered emotional distress, anxiety, humiliation, frustration, and mental anguish. Plaintiff suffered

damage to her professional reputation. Plaintiff incurred economic and non-economic damages, including loss of pay and benefits during periods of suspension, loss of TSP contributions during suspension periods, costs associated with the forced relocation and associated process, and out-of-pocket moving expenses she was required to fund personally due to Defendant's unreasonable delay in processing her reimbursement voucher from May 2024 through December 5, 2024 — the date the final PCS travel voucher was ultimately processed, a delay spanning approximately seven months.

115.    The delay continued through and beyond a medical emergency Plaintiff suffered in late 2024. On or about December 5–6, 2024, despite her medical condition, Plaintiff provided status updates on her pending work assignments to Ms. Wlezien; this can be corroborated by a witness present and by Plaintiff's physician, who advised Plaintiff that her health was at serious risk from continuing to work under those conditions. Plaintiff continues to suffer the effects of Defendant's unlawful conduct.

## COUNT 1
## AGE DISCRIMINATION
## (ADEA, 29 U.S.C. § 633a)

116.    Plaintiff incorporates by reference paragraphs 1 through 115 as though fully set forth herein.

117.    Plaintiff was born in 1950 and was over forty years of age at all times relevant to this action.

118.    Defendant subjected Plaintiff to adverse employment actions including, but not limited to: an October 2022 Letter of Reprimand; a February 2023 two-day suspension; a May–June 2024 ten-day suspension; and revocation of Plaintiff's telework/remote work privileges in 2023.

119.    Defendant treated younger, similarly situated employees more favorably than Plaintiff. Specifically, CW2 (born approximately 1963) and CW1 (born approximately 1959) engaged in the same or substantially similar performance conduct and were either not disciplined or received lesser disciplinary actions. CW2 received only a Letter of Warning — a lesser sanction — and improved without further discipline. No other employee under Ms. Wlezien's supervision was subjected to the same escalating three-step discipline sequence imposed on Plaintiff.

120.    Defendant's stated reasons for the disciplinary actions — "careless workmanship" — were pretextual. The record shows that Plaintiff's alleged deficiencies arose directly from management's failure to provide adequate training in the "Eastern Orange Team Methodology," and that management declined to provide Plaintiff the same coaching and corrective support that effectively resolved CW2's performance concerns before discipline was escalated.

121.    Defendant's actions were motivated, in whole or in part, by Plaintiff's age. Age was a factor in the challenged personnel actions, disciplinary measures, and adverse treatment described herein. Defendant's conduct violated the federal-sector provisions of the ADEA, 29 U.S.C. § 633a, which require that federal personnel actions be made free from age discrimination.

<u>COUNT 2</u>
<u>RETALIATION</u>
<u>(ADEA, 29 U.S.C. § 633a; Rehabilitation Act, 29 U.S.C. § 791)</u>

122.    Plaintiff incorporates by reference paragraphs 1 through 121 as though fully set forth herein.

123.    Plaintiff engaged in protected activity, including but not limited to: (a) filing an administrative grievance on October 19, 2022 alleging age discrimination; (b) initiating formal EEO counseling on February 28, 2023; (c) filing a formal EEO complaint (DHRA-007-2023) on

April 10, 2023; (d) submitting a reasonable accommodation request on May 17, 2024; (e) initiating formal EEO counseling on June 21, 2024 and filing a second formal EEO complaint (DHRA-009-2024) on July 23, 2024; and (f) participating in an EEOC hearing process through depositions of Ms. Wlezien and Mr. Fendt on June 20–21, 2024.

124.    Defendant was aware of Plaintiff's protected activity at all relevant times.

125.    Defendant thereafter subjected Plaintiff to materially adverse actions including but not limited to: (a) the January 2023 proposed two-day suspension approximately three months after Plaintiff's grievance; (b) a May 2024 proposed ten-day suspension within weeks of the deposition notices; (c) an AWOL threat over medically supported sick leave taken during Plaintiff's pending EEO activity and accommodation process; (d) repeated obstruction of Plaintiff's reasonable accommodation request through delays, refusal to accept functionally equivalent medical authorizations, and unnecessary procedural barriers; (e) denial of Plaintiff's accommodation request after months of obstruction despite contemporaneous approval of the same remote-work arrangement outside the accommodation process; (f) denial of Plaintiff's accommodation appeal; and (g) delay of Plaintiff's travel voucher reimbursement while approving comparable employees' vouchers promptly.

126.    The temporal proximity between Plaintiff's protected activities and Defendant's actions, the escalating pattern of discipline, the obstruction of Plaintiff's accommodation request after she engaged in EEO activity, and Defendant's approval of the same remote-work arrangement outside the accommodation process support a reasonable inference of retaliatory motive.

127.    Defendant's actions would deter a reasonable employee from engaging in protected activity and constitute unlawful retaliation in violation of the ADEA and the Rehabilitation Act.

COUNT 3
HOSTILE WORK ENVIRONMENT
(ADEA, 29 U.S.C. § 633a; Rehabilitation Act, 29 U.S.C. § 791)

128.    Plaintiff incorporates by reference paragraphs 1 through 127 as though fully set forth herein.

129.    Plaintiff is a member of statutorily protected classes based on her age (over 40), her disability (PTSD and anxiety), and her prior EEO activity.

130.    Defendant subjected Plaintiff to unwelcome conduct including, but not limited to, all of the conduct described in the Factual Allegations section above, spanning from 2022 through 2024.

131.    The unwelcome conduct was based upon Plaintiff's membership in protected classes. The pattern of conduct — including escalating discipline, heightened scrutiny, deliberate exclusion from communications, interference with survey assignments, AWOL threats during medically supported leave, obstruction of the accommodation process, and retaliatory timing of adverse actions — would not have occurred but for Plaintiff's age, disability, and protected EEO activity.

132.    The conduct, viewed in its totality, was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive working environment. Objectively, a reasonable person in Plaintiff's position would find the environment hostile and abusive: the conduct spanned more than two years; involved repeated formal disciplinary actions, AWOL threats, accommodation denials, and obstruction of Plaintiff's legal rights; was carried out by multiple supervisors across three levels of the chain of command; was accompanied by documented failures to follow the Agency's own anti-harassment procedures; and escalated in severity over time, including formal suspensions that directly reduced Plaintiff's compensation and threatened her federal career.

36

133.    Plaintiff experienced the environment as hostile and abusive: she suffered emotional distress, anxiety, humiliation, and professional harm, was compelled to seek psychological treatment for PTSD and anxiety exacerbated by the work environment, and ultimately was required to request a reasonable accommodation to manage symptoms caused in part by the conditions of her employment. The pattern threatened Plaintiff's tenure and economic security, and caused Plaintiff significant emotional distress and professional harm.

134.    There is a basis for imputing liability to Defendant because the harassing conduct was carried out by Plaintiff's supervisors and agency officials acting within the scope of their authority.

COUNT 4
DISABILITY DISCRIMINATION
(Rehabilitation Act, 29 U.S.C. § 791)

135.    Plaintiff incorporates by reference paragraphs 1 through 134 as though fully set forth herein.

136.    Plaintiff is a qualified individual with a disability within the meaning of the Rehabilitation Act. Plaintiff has been diagnosed with PTSD and anxiety, conditions that substantially limit one or more of her major life activities, including memory, concentration, focus, judgment, emotional regulation, and occupational functioning. These conditions are episodic in nature but substantially limit Plaintiff's major life activities when active. In the alternative, Defendant regarded Plaintiff as having a disability no later than May 22, 2024, when Ms. Wlezien received Plaintiff's accommodation request packet. The ROI for DHRA-009-2024 confirms that Ms. Wlezien "did consider CP to have a medical impairment" from that date forward, satisfying the "regarded as" prong of 29 C.F.R. § 1630.2(g)(1)(iii).

137.    Plaintiff is qualified for the GS-12 Human Resources Specialist position. Plaintiff has performed her job duties successfully for many years with reasonable accommodation and, with full-time remote work in place since July 2024, continues to perform those duties.

138.    Defendant discriminated against Plaintiff because of disability. Specifically, Defendant: (a) denied Plaintiff's reasonable accommodation request after months of bad-faith delay while approving the same practical relief outside the accommodation framework; (b) threatened Plaintiff with AWOL status for medically supported sick leave taken while her accommodation request was pending; (c) required Plaintiff to complete authorization forms containing fitness-for-duty evaluation language broader than permitted under the Rehabilitation Act; (d) subjected Plaintiff to heightened scrutiny and disciplinary action while her disability-related accommodation needs were pending; and (e) took action against Plaintiff that would not have occurred absent Defendant's awareness of and animus toward Plaintiff's disability.

139.    Defendant's actions violated the Rehabilitation Act's prohibition on discrimination against qualified individuals with disabilities.

COUNT 5
FAILURE TO ACCOMMODATE
(Rehabilitation Act, 29 U.S.C. § 791)

140.    Plaintiff incorporates by reference paragraphs 1 through 139 as though fully set forth herein.

141.    Plaintiff has a disability as defined by the Rehabilitation Act. Plaintiff is a qualified individual with a disability. Plaintiff gave Defendant timely notice of her disability and her need for accommodation on May 17, 2024.

142.    Defendant failed to engage in the interactive process in good faith. Defendant prolonged the interactive process for months while repeatedly rejecting Plaintiff's submitted authorizations,

declining to accept functionally equivalent alternatives, and ultimately denying Plaintiff's request on procedural grounds attributable to Defendant's own refusal to accept Plaintiff's authorizations.

143.    On September 2, 2024, Plaintiff formally appealed the accommodation denial in writing pursuant to DHRA OI 3-2-21, Section 6, addressed to Mr. Fendt (the second-level reconsideration authority) and copied to DCPAS Director Daniel Hester and DHRA Director Jeffrey Register. The appeal enclosed fourteen supporting exhibits including: the signed denial forms (DHRA Forms 4 and 5); all physician documentation; all interactive process records; every authorization form Plaintiff had submitted; the August 14, 2024, direct transmittal to CHS; the CHS confirmation that it had begun processing; the August 26, 2024, CHS response; the signed remote work approval memorandum showing zero mission impact; and a physician letter documenting the harm from the accommodation delay.

144.    The appeal argued that the DHRA Form 6 and two HIPAA authorizations Plaintiff had provided since July 2024 were legally sufficient under 45 C.F.R. § 164.510, and that the CHS forms demanded by the Agency contained impermissible fitness-for-duty language. On September 9, 2024, Mr. Fendt denied the appeal on the same pretextual grounds — relying on a mischaracterization of Plaintiff's interactive-process testimony that the interactive process record directly refutes.

145.    Defendant failed to provide Plaintiff with an effective reasonable accommodation. The interim accommodations offered — a private office and maxi-flex schedule — did not address Plaintiff's documented need to control environmental triggers. Full-time remote work, which Plaintiff's physician specifically recommended, is reasonable on its face for three independent reasons: (a) Plaintiff worked remotely from March 2020 through July 2024 — more than four

39

years — with no identified mission impact, security concern, or operational disruption; (b) the Agency itself approved an identical full-time remote work arrangement effective July 24, 2024, through the SES2 remote work waiver, demonstrating the feasibility and manageability of that arrangement; and (c) Plaintiff's position is designated remote-eligible, as confirmed by the Position Description at TAB C of the August 23, 2024, remote work approval memorandum, and by the waiver's own findings that the arrangement created no mission impact, no security concerns, no financial impact, and no travel impact. The arrangement would not have created undue hardship, as demonstrated by the Agency's own conduct.

146.    Defendant's failure to accommodate was not the product of a good-faith interactive process. Rather, Defendant repeatedly imposed procedural obstacles, rejected functionally equivalent medical authorizations, delayed required actions under its own accommodation policies, and denied Plaintiff's request despite contemporaneously approving the same remote-work arrangement through a separate management process. These facts support the inference that Defendant's handling of the accommodation request was influenced by Plaintiff's prior protected EEO activity and was not undertaken in good faith.

147.    Defendant denied Plaintiff's accommodation request and reconsideration on pretextual grounds. Mr. Fendt's stated reason for denying reconsideration — that Plaintiff's ability to work at survey sites contradicted her need for accommodation — was directly refuted by Plaintiff's own testimony in the interactive process record, which explained the coping strategies she used at survey sites that would not be available in the Mark Center environment.

148.    Defendant's failure to accommodate Plaintiff's disability violated the Rehabilitation Act.

COUNT 6
IMPROPER MEDICAL INQUIRY
(Rehabilitation Act, 29 U.S.C. § 791)

149. Plaintiff incorporates by reference paragraphs 1 through 148 as though fully set forth herein.

150. The Rehabilitation Act prohibits an employer from requiring medical examinations or making disability-related inquiries of employees unless the examination or inquiry is shown to be job-related and consistent with business necessity. 29 C.F.R. § 1630.14(c).

151. The CHS authorization forms that Defendant required Plaintiff to complete authorized CHS to use Plaintiff's medical information for "evaluation purposes relating to medical screening, employment or assessment of [Plaintiff's] fitness for duty" — language that goes beyond what is permissible for reasonable accommodation purposes. A fitness-for-duty evaluation is a medical inquiry that must independently satisfy the job-related and business-necessity standard. The Agency's stated purpose for the CHS referral was to assist in determining effective accommodations, not to conduct a fitness-for-duty evaluation; the forms' broader authorization language was therefore unnecessary, inconsistent with the stated purpose, and impermissible under the Rehabilitation Act.

152. Plaintiff offered multiple alternative authorizations that would have permitted CHS to review her medical documentation for accommodation purposes while limiting the scope of the inquiry to what was job-related and consistent with business necessity. The Agency's refusal to accept these alternatives and insistence on fitness-for-duty-scope authorization forms constituted an improper medical inquiry and an improper condition on Plaintiff's right to accommodation.

153. Defendant's conduct in this regard constitutes an unlawful disability-related inquiry and an improper medical examination in violation of the Rehabilitation Act.

41

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mary L. Defibaugh respectfully requests that the Court enter judgment in her favor and award the following relief:

a)      Declare that Defendant violated Plaintiff's rights under the Age Discrimination in Employment Act, 29 U.S.C. § 633a, and the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.;

b)      Order Defendant to rescind and expunge all unwarranted discipline, including the Letter of Reprimand, the two-day suspension, and the ten-day suspension, and any related warnings, AWOL codings, or disciplinary records arising from Defendant's discriminatory and retaliatory conduct;

c)      Order Defendant to restore all pay, leave, benefits, and other compensation lost as a result of the Agency's discriminatory, retaliatory, and unlawful conduct, including pay and benefits lost during the two-day and ten-day suspensions;

d)      Order Defendant to rescind any denial of advanced sick leave or other paid leave caused by Defendant's refusal to accommodate Plaintiff;

e)      Order Defendant to remove from Plaintiff's employment file all allegations, references, warnings, and records arising from discrimination, retaliation, denial of reasonable accommodation, or medically supported absences;

f)      Order Defendant to cease disclosing Plaintiff's medical information except as permitted by law;

g)      Award Plaintiff back pay for all pay lost during the two-day suspension (February 2023) and the ten-day suspension (May–June 2024), together with pre- and post-judgment interest on those amounts at the applicable federal rate, plus any lost TSP contributions and government matching contributions during those periods; award front pay for any future loss of earning

42

capacity, career advancement, or employment opportunity attributable to the discriminatory and retaliatory discipline; award lost overtime, lost credit hours, leave restoration, and all other make-whole relief;

h)     Award Plaintiff compensatory damages, including non-pecuniary damages for physical and emotional pain, embarrassment, humiliation, mental anguish, loss of career and professional opportunities, and loss of quality of life, in an amount to be proven at trial;

i)     Award Plaintiff reasonable attorney's fees, costs, and expenses incurred in this action and in the administrative proceedings that necessarily preceded it, pursuant to 42 U.S.C. § 2000e-5(k) and 29 U.S.C. § 794a; and

j)     Grant such other and further relief as the Court deems just and proper.

Dated: June 24, 2026

Respectfully submitted,

/s/Daniel K.R. Maharaj

SOLOMON, MAHARAJ & KASIMATI, PA
5005 West Laurel Street, Ste 216
Tampa, FL 33607
daniel@smkfirm.com
813-565-1201
Bar ID: 252819
*Counsel for Plaintiff*

## CERTIFICATE OF TRANSMISSION

I hereby certify that the forgoing COMPLAINT with EXHIBITS A-C are being electronically transmitted via the CM/ECF system of the U.S. District Court for the District of Columbia at on the date noted below. The requisite filing fee of $405.00 and any additional fees related to this matter are being charged to a credit card concurrently with this filing.

Dated: June 24, 2026

Respectfully submitted,


/s/Daniel K.R. Maharaj

*Counsel for Plaintiff*